In the Matter of the Bark Kalakaua.

## SUPREME COURT—IN BANCO.

### JULY TERM, 1880—IN ADMIRALTY.

*Harris, C. J., and Judd, J., (McCully, J., dissenting).*

IN THE MATTER OF THE BARK KALAKAUA.

ON APPEAL.

OPIUM WAS SMUGGLED from a vessel. It appearing to the Court that the facts in evidence did not exculpate the mate from complicity with and guilty knowledge of the transaction, the vessel was condemned.

Opinion of a majority of the Court by JUDD, J.

The Collector General of Customs on the 13th of November,

1879, filed a libel in this Court, alleging that on the 2d of said November, thirty-six tins of opium, containing each about three and one-half pounds, had been smuggled into this country from the bark Kalakaua, and praying for the condemnation and forfeiture of the said vessel, her tackle, apparel and furniture, and the opium aforesaid, to the use of the Hawaiian Government. After a full hearing, the Chief Justice on the 24th of November decreed the condemnation as prayed for. Appeal was taken to the Court in Banco, and at the hearing a number of affidavits which had been taken *ex parte* in San Francisco were admitted by consent of the libellant, and also other evidence was introduced. It appearing that the Court were unable to agree, a re-argument was ordered, which was accordingly had before the full Court at the July Term, 1880.

Meanwhile, on the 24th of January, 1880, an order was made allowing the vessel to be discharged from the Marshal's custody upon filing a satisfactory bond, which was done.

The various questions of law which were raised by counsel for claimants have been decided by this Court in former cases, and there is no occasion to review them now.

We understand that the Government does not press the condemnation of the vessel, unless it is shown that the owner, master or mate were principals or accomplices in the transaction of smuggling opium; that is, if the smuggling was done by passengers or shippers, and the circumstances show that it was done without the complicity of those in charge of the vessel and that they could not reasonably have prevented it, we are not asked to decree condemnation.

That the alleged quantity of opium skillfully concealed in thirty-six sticks of firewood was brought to this port in the said bark is admitted. It is conceded by the libellant's counsel that the evidence exculpates the owner in San Francisco.

George W. Jenks, the master of the bark, admits in his answer that thirty-six tins of opium were brought into this Kingdom in the bark, but says that after she arrived in

Honolulu, and while she was discharging, the opium was discovered by Custom House officials, concealed in pieces of firewood which had been brought as freight; that about twenty cords of this firewood had been shipped on the bark in San Francisco by one or more Chinamen, one of whom came as passenger, whose name he had forgotten, and who paid freight on the firewood at Honolulu. The mode of concealing the opium in the firewood, as shown by the specimen in Court, was by splitting the stick, mortising a place in the stick large enough to contain a tin cylinder eighteen inches or so long, which was placed in the mortise and the two pieces of wood fastened together by glue and nails.

Mr. W. A. Markham, Port Surveyor and Custom House Guard, testified that the bark arrived on Sunday, the 2d day of November; that he went on board and asked the captain if he had any Chinese passengers; he said "yes;" asked him if the Chinese had any freight; he said "no;" which is argued does not correspond with his averment in his answer that a Chinese passenger had brought the wood as freight. The wood is not on the inward manifest, but the freight list shows that twenty cords of firewood were shipped by Chinamen consigned to Tongkee, freight $5.50 per cord. It is noted on the freight list "no mark," "no bill of lading."

Mr. Eldrich, a clerk of W. G. Irwin & Co., the consignees of the vessel, testifies that a Chinaman paid the freight upon the wood, $125. Eldrich asked him if his name was Tongkee, and he said "yes." He paid the money and got an order for the wood.

Col. W. F. Allen, the Collector General, says that a Chinaman brought a Custom House blank permit with twenty cords of firewood written upon it for a permit. "He did not know his name, said the firewood did not belong to him, and I told him he could not get a permit; he said he knew who it belonged to, and I told him that the party must come for it; have never seen him since, nor has any one applied for permit for the wood."

The passenger list signed by the captain contains the name of Afong as passenger, the only Chinaman on board. Capt. Jenks testified that he did not include the firewood on the inward manifest because he had no record of it, because there was no bill of lading for it. On being shown that the wood was on the freight list, he said he did not know whether the list was opened on the voyage down or not, and on reflection added that he had looked at it to see the amount of the freight money. He says that the Chinaman who came down as passenger brought him in Honolulu the receipted freight bill, and that was the first he knew he claimed the wood.

He said further that this Chinaman was not entered as a passenger at the office, but that he found him on board twenty minutes after the vessel left, and made him pay $20 passage money under threats of putting him off on the tugboat.

A. L. Ritchie testified that he is the master of the bark D. C. Murray, but was mate of the Kalakaua, and in that capacity superintended her loading at San Francisco. He took command of the Murray, and both vessels sailed the same day from San Francisco. He says that this firewood, which he judged by his eye to be twenty cords, was hauled down to the vessel by two Chinamen on a one-horse dray. He took the Chinamen's word that it was twenty cords. Seven loads were hauled the first day, afterwards three loads, and two loads another day, and so on. That he took the first lot down below and used it as dunnage. We piled the wood on the wharf until we wanted to use it. He says that he did not know the Chinamen, that he did not give them a receipt because they did not come for it, but said he would when all the wood was down. That he did not put the wood on the cargo book because he had given no receipt for it, and no bill of lading had been given for it because it was not down on the cargo book. It took about a week to bring all the wood down. Part of the wood was used as dunnage fore and aft and part placed on deck. What we did not require for dunnage we placed on deck.

In the Matter of the Bark Kalakauá.

It is in evidence that all the wood was estimated on dis-
charging to be about 16⅔ cords, and of this abo-t 12 ᵘ rds
were on deck, that all of the 36 sticks containing c ᵢium were
stowed in the hold and used as dunnage. The di ov ry was
made after all the cargo of the bark but wood and ᵣ ick had
been discharged, as late as Friday, the vessel ha᷾ ng egun
to be discharged on Monday. At that time, F᷾ id y nearly
all the wood that contained no opium had been disc ᵣ rged on
to the wharf, and the wood containing the opium re᷾ ained in
the hold. We have then two remarkable facts—fi t, all the
wood that was loaded with opium, say 36 sticks out f several
thousand, had been stowed under deck away ᵣ o᷾ ᵢ obser-
vation; and *secondly,* all this loaded wood was t ᵢe l ᵢst to be
discharged, and had not been discharged when ᵗhe ᵢ iscovery
took place. Another very significant fact whic᷾ ᵢ was testified
to must be mentioned here: on the previous vo᷾ age a ᵢundred
tins of opium were found concealed in the ᵗore-pea᷾ under
firewood used as dunnage belonging to the sh᷾ p. Thi᷾ is very
important evidence. The opium on the previous voyage could
hardly have been concealed in such a pla᷾ e without the con-
nivance of some one connected with the vessel. Another
attempt similar in character is made in the case before us;
like methods of concealment are used, and the inference is
that the sticks containing the opium were stowed below by
the assistance of some one connected with the vessel, and that
it was not to be put out until the rest of the wood had been
discharged and delivered. If the wood was left out of the
inward manifest by design, it might have been with the in-
tention of putting the Custom House officers on a false scent,
and finally when the danger was over, the sticks containing
opium, retained in the hold, were to be delivered to the con-
signee or purchaser.

There are many points in the evidence difficult to be recon-
ciled. Captain Jenks is not sufficiently impressed with the
fact that these sixteen or twenty cords of firewood were on

42

his ship to remember to put them on his inward manifest, though they were on his freight list, and the largest part of the wood itself was on deck and in sight during the voyage down, and though the owner, Mr. Merrill, testifies that he had sent the captain to examine the wood in San Francisco and see if it was straight, of which fact he (the captain) says nothing in his examination, though he mentions it after the San Francisco depositions had been received here. It has not been explained to us where Captain Jenks saw the wood, at the Renton Coal Company's yard (where sixteen cords were bought), at Higgins & Collins' yard (where three cords were bought), or elsewhere. If he went as was likely in company with the Chinamen, they pointing the wood out which they had bought or intended to buy, how could it be true as the captain states that the first he knew that the Chinaman claimed the wood was on his presenting him the freight bill receipted in Honolulu? Another palpable contradiction is in the statements as to which wood was first stowed below to be used as dunnage.

Mr. Ritchie, the mate, says, "the first lot (hauled) we took down below and used it for dunnage fore and aft." The witnesses whose testimony was taken in San Francisco all agree that the first lot of wood was hauled from the Renton Coal Company's and was honest wood, there having been no opportunity for tampering with it. Mr. Ritchie also says, "this firewood was hauled down on a one-horse dray by two Chinamen," and again, "two Chinamen hauled the wood on a dray," and "took Chinamen about a week to bring all the wood down." The depositions of many persons in San Francisco agree that sixteen cords were drayed down from the Renton coal yard by Charles Aigeltinger, the three cords from Higgins & Collins by A. Saxtorph, and Mr. Ennis, the clerk of the Kalakaua, says, "a third drayman, also a white man, brought down one and perhaps more loads."

Which wood contained the opium? Mr. Ritchie says that

In the Matter of the Bark Kalakaua.

the wood first delivered was put below as dunnage. The San Francisco witnesses say that this was honest wood and could not have contained opium. If the last load hauled by the mysterious third drayman, said to have come from China-town, contained it, then Ritchie does not tell the truth, since the wood containing opium was used as dunnage and was put down first. If it be said that the opium came among the last wood delivered, the ship at that time was nearly loaded, her cargo already stowed, and this wood could not have been used as dunnage under it.

Ahchin, the assistant salesman in the Renton coal yard, says that while the wood was being delivered, as re-quired for loading vessel, the two Chinamen told him they had one load of wood up town which they wanted our dray-man to haul to the Kalakaua. If this is the load referred to by Mr. Ennis as "the one load or posssibly more loads," hauled by the third drayman, it must have been hauled after the larger part of the wood had been delivered at the ship's side and stowed below, and it would follow that it was not used as dunnage.

Mr. Ritchie says that one of the two Chinamen who brought the wood to the ship came down as passenger in the bark. But Ahchin, above named, says that since the sailing of the Kalakaua he saw these two Chinamen who had brought the wood, in San Francisco. It is, therefore, impossible that one of them could have come down in the bark.

It has not been explained why, if Mr. Merrill, Mr. Brow and others knew the names of the shippers of the wood to be Ah Sing and Ah Foo, as they say they did, that these names were not put down in the freight list, whereas the names of the consignee Tonkee was inserted, a man whose identity seems to have been lost.

Mr. Ennis says: "The wood was handled roughly and thrown a considerable distance by draymen on a pile. Every stick was handled by the draymen and the Chinamen in dis-

In the Matter of the Bark Kalakaua.

charging the loads as they came to the vessel." The persons, whoever they were, who were aware that some of these sticks contained tins of opium, must have had such confidence in its solidity and security inside the sticks of wood as to have made it unnecessary to use caution in its handling, and the mere suggestion to handle such articles carefully would have been suspicious of itself. Wood that stood successfully the tossing on to a pile on the wharf could be trusted to stand the further test of being stowed below deck. It seems to us that the sticks containing opium were placed below, more for convenience in being put ashore at Honolulu successfully, than to escape the notice of ordinary observers on the passage down, for the wood that was landed gave no indication outwardly of its contents except on a very close scrutiny.

The fact that Mr. Ritchie did not come down in the vessel, and, therefore, could have been expected to have given his assistance in any way to the landing of the opium at Honolulu, is urged as proof that he had no guilty knowledge of or complicity with the enterprise. If he arranged matters so that the sticks of wood containing the opium should be put below and used as dunnage so that they could have been left in the vessel after she was discharged, without suspicion, and finally put ashore, this is sufficient to charge the vessel with responsibility. For an owner in a foreign port would do no more than to put the contraband article on board where it would be likely to escape detection and leave it to confederates to land it. Captain Ritchie sailed as master of the D. C. Murray on the same day with the Kalakaua, and might reasonably have hoped to have been at this port in time to have received his share of the venture, if it proved successful. That some Chinamen, both in San Francisco and in Honolulu, were concerned in this affair we cannot doubt. Considering the nature of the article smuggled—opium—a drug which goes to California from China, and which is smuggled into this country for the purpose of being sold to Chinamen here, who are its

In the Matter of the Bark Kalakaua.

chief consumers, it is hardly possible that opium could be smuggled here without the active co-operation of Chinamen, either as vendors and shippers or as consignees and purchasers. But the question for us to decide is not whether the unknown Chinamen are guilty but whether, in view of all the facts and circumstances, those in charge of the vessel are exculpated from complicity with this smuggling.

We are of the opinion that the evidence does not exculpate them, but that the guilty knowledge and complicity of the mate, if not of the Captain as well, is established, and there-fore confirm the decree of condemnation made by the Chief Justice on the 24th of November last.

Messrs. Castle & Hatch, proctors for libellants.

A. S. Hartwell and S. B. Dole, proctors for claimants.

Honolulu, August 27, 1880.

DISSENTING OPINION OF MR. JUSTICE McCULLY.

As dissenting in respect to the conclusions of fact from the opinion of the Court, I deem it proper to state briefly my view of the case. The important condemning fact which attaches the guilt of confederacy with the Chinamen to one or more officers of the ship is, that the thirty-six loaded sticks were all among the wood used as dunnage. The argument which is so strongly put by the Court, would lose its basis if the opium sticks had gone with the wood on deck or had been found scattered among the deck load, under the hatch, or in the dunnage, for it would not have needed the help of the ship's officers to let them go as they might, on and off the ship. But it seems to me (1) quite within the chances of things that the loaded sticks should have all gone to the same part of the ship, it being likely that they were brought in one load; and (2) that it is not clear that it was desirable to the principals in the smuggling venture that their particular sticks should go below. The wood which went below, and particu-larly if to be used as dunnage, must receive rougher usage.

In throwing it down, stowing it and pitching up, it would be subject to more chances of splitting, of scrutiny and generally an accidental discovery. I do not think that the chance of its passing to the wharf and being carted away would be so good for the dunnage as for a deck load. There would be greater danger that a few of the loaded sticks should be left at last, and it would not do to inquire for the missing sticks of wood. The danger of jettison would not be taken into account in such a voyage as may be expected between San Francisco and Honolulu in a matter which was all a risk. If the scheme of the operation was that the shipment should go as common firewood, it would not be aided by stowing the valuable sticks below. The form of the disguise was to be its protection, and the less the variation in its treatment from honest cargo, the better the chance of escaping detection. I cannot draw an inference that these men were over cunning, and took in an alien confederate to divide the profit for aiding to do what was of such very doubtful value to the venture.

I am furthermore drawn from the opinion that the mate, likewise the Captain were partners in the attempted smuggling by the failure to enter the wood on the cargo book, and afterwards on the inward manifest. It does not appear likely that men accustomed to Custom-house formalities would have omitted such simple routine entries if they had possessed a guilty knowledge, and had an interest in the shipment being passed along beyond the point of danger without unnecessary inquiry and obstruction.

I am forcibly struck by the discrepancies in the statements of witnesses with themselves and with each other. If I could assume them guilty, unless they could prove themselves innocent, I might agree with the majority of the Court, but clear proof that any officer was concerned in the smuggling, I do not find, either in the testimony or in the circumstances of the transaction.

Honolulu, August 27, 1880.